**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

United States of America,

Plaintiff,

v.

Ryan Phillip Schlesinger,

Defendant.

No. CR-18-02719-001-TUC-RCC (BGM)

**ORDER**

Before the Court is Defendant Ryan Schlesinger's Motion to Strike the Death Penalty. (Doc. 260.) Schlesinger argues that the death penalty, as it is administered under the Federal Death Penalty Act ("FDPA"), is unconstitutional. (Doc. 260.) The Government filed a response in opposition (Doc. 322), to which Schlesinger filed a reply (Doc. 344). The motion is denied for the reasons set forth herein.

## I.      BACKGROUND

On November 30, 2018, a complaint was filed against Schlesinger charging him with the premeditated killing of Deputy United States Marshal C.W. in violation of 18 U.S.C. §§ 1111 and 1114. (Doc. 1.) C.W. was shot and killed while serving Schlesinger with a felony arrest warrant on November 29, 2018. (*Id.*)

The Government filed a superseding indictment on September 30, 2020, charging Schlesinger with two death-penalty eligible counts: first-degree murder of a federal officer in violation of 18 U.S.C. §§ 1111(a) and 1114 (Count One) and the use of a firearm during

and in relation to a crime of violence causing the Marshal's death in violation of 18 U.S.C. §§ 924(c)(1)(A) and (j) (Count Nine). (Doc. 192 at 1–5.)

The grand jury alleged additional special findings in conformity with the FDPA, charging Schlesinger with among other things, the "substantial planning and premeditation" statutory aggravator under 18 U.S.C. § 3592(c)(9). *Id.*

On October 2, 2020, the Government filed an amended Notice of Intent ("Notice"), alleging that a sentence of death was justified in the event of a conviction on either Count One or Count Nine. (Doc. 194 at 1.) The Notice alleged two non-statutory aggravators, future dangerousness and victim impact. (*Id*. at 3–4.)

The matter is set for a jury trial on January 17, 2023.

Schlesinger filed the pending motion on May 4, 2021. (Doc. 260.) He raises a number of challenges to the death penalty in general and to its administration under the FDPA. He argues that the death penalty violates the Eighth Amendment by creating a risk that an innocent person will be executed. He contends, citing alleged racial, gender, and geographic disparities, as well as federal prosecutors' discretion in seeking a capital sentence, that the death penalty is applied in an arbitrary and capricious manner. He argues that long delays in execution eliminate the deterrent or retributive value of capital punishment and that the many years a death row inmates spends in isolation constitute an impermissible secondary punishment. Finally, he argues that evolving standards of decency, as reflected in decreasing public support for capital punishment, render the death penalty unconstitutional.

## II.   FDPA

The FDPA, 18 U.S.C. §§ 3591–3598, which was signed into law in 1994, "defines the circumstances under which a defendant who commits certain federal crimes may be eligible for the death penalty." *United States v. Mills*, 393 F.Supp.3d 650, 658 (E.D. Mich. 2019). The FDPA sets forth the qualifying offenses in § 3591(a)(1)–(b)(2). The Government must provide the defendant with notice of its intent to seek the death penalty and the basis for seeking the death penalty. 18 U.S.C. § 3593(a).

The FDPA also sets forth the mechanics of a federal death penalty trial. First, the jury must decide whether the defendant had the requisite intent to commit the death eligible offense. *Id.* The jury must unanimously find that intent was established beyond a reasonable doubt to move to the penalty phase. If the jury makes that finding, it then considers the statutory aggravating factors alleged by the government in the notice of intent to seek the death penalty. *Id.* § 3592 (b)–(d). The jury must unanimously determine that the government has proven at least one of the statutory aggravating factors beyond a reasonable doubt. *Id.* § 3593(c). If the jury makes that finding, the case moves to the selection phase of the sentencing hearing. *Id.* § 3593(e). There, the jury considers the statutory aggravating factors, plus any non-statutory aggravating factors for which notice has been given, and weighs them against any mitigating factors. *Id.* Non-statutory aggravating factors must be found unanimously beyond a reasonable doubt, while mitigating factors need only be established by a preponderance of the evidence. *Id.* § 3593(c)–(d). The jury must determine whether "all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death." *Id.* § 3593(e). The jury's sentencing recommendation must be unanimous. *Id.*

## III.   DISCUSSION

Several legal standards guide the Court in addressing the merits of Schlesinger's arguments. First, "it is settled that capital punishment is constitutional."[1] *Glossip v. Gross*, 576 U.S. 863, 869 (2015). Next, the Court presumes that the FDPA is constitutional, *see United States v. Sampson*, 486 F.3d 13, 20 (1st Cir. 2007); *see also Gregg v. Georgia*, 428 U.S. 153, 175 (1976) (plurality opinion) ("[I]n assessing a punishment selected by a democratically elected legislature against the constitutional measure, we presume its

---

[1] The Court rejects Schlesinger's argument that "the doctrine of stare decisis does not limit this Court's actions." (Doc. 260 at 138.) The Supreme Court has explained that "[o]ur decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." *Bosse v. Oklahoma*, 137 S. Ct. 1, 2 (2016) (quoting *Hohn v. Unites States*, 524 U.S. 236, 252–53 (1998)).

validity."). Schlesinger bears the heavy burden of proving that the FDPA is unconstitutional. *Sampson*, 486 F.3d at 20 (citing *Lujan v. G & G Fire Sprinklers, Inc.*, 532 U.S. 189, 198 (2001)); *see also INS v. Chadha*, 462 U.S. 919, 944 (1983) ("We begin, of course, with the presumption that the challenged statute is valid."). "A facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully." *Mills*, 393 F.Supp.3d at 658 (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

That said, many of Schlesinger's challenges to the FDPA are in fact challenges to the death penalty itself, which Schlesinger argues, violates the Fifth and Eighth Amendments. (Doc. 260 at 7–11.) As discussed below, courts at every level have considered and rejected such claims.

In support of his arguments Schlesinger relies largely on the "roadmap" set out by Justice Breyer in his dissenting opinion in *Glossip*, 576 U.S. at 908–46 (Breyer, J. and Ginsburg, J., dissenting); a district judge's factual finding, reached after an evidentiary hearing, that the death penalty under the FDPA is imposed arbitrarily, *United States v. Fell*, 224 F.Supp.3d 327, 358 (D. Vt. 2016); and a ruling by the Connecticut Supreme Court which held that the death penalty was cruel and unusual punishment under the state constitution, *State v. Santiago*, 318 Conn. 1, 122 A.3d 1 (Conn. 2015).[2] (Doc. 260 at 3–5.) Schlesinger also cites numerous studies and statistics to support his arguments that the death penalty is imposed in an arbitrary and biased manner.

The opinions and data on which Schlesinger relies do not constitute authority which would permit this Court to grant the relief he seeks. Indeed in *Fell* the district court denied the defendant's motions to dismiss the death penalty and to find the FDPA unconstitutional. 224 F.Supp.3d at 358–59. The court cited *Gregg*, 428 U.S. at 206–07, where the Supreme Court held that the death penalty is not per se unconstitutional, and *McCleskey v. Kemp*, 481 U.S. 279, 319 (1987), which rejected various challenges to the death penalty, including

---

[2] The court in *Santiago* held that Connecticut's death penalty, which had been abolished non-retroactively, did not comport with the state's contemporary standards of decency and no longer served a penological purpose. 318 Conn. at 85–86, 118–19, 122 A.3d at 54–55, 73.

arguments using social science data to demonstrate racial bias. *Fell*, 224 F.Supp.3d at 358–59. Accordingly, despite its conclusions about the arbitrariness of the death penalty, the court in *Fell* acknowledged that "*Gregg* is still the law of the land." *Id.* at 358. The court explained that "[i]nstitutional authority to change this body of law is reserved to the Supreme Court." *Id.* at 359.

As the court did in *Fell*, this Court recognizes that it is the "prerogative" of the Supreme Court "alone to overrule one of its precedents." *Id.* (quoting *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997); *see United State v. Aquart*, 912 F.3d 1, 49 (2d Cir. 2018) ("[O]nly the Supreme Court can overrule *Gregg* or recognize exceptions thereto."). With that reality in mind the Court considers Schlesinger's arguments.

### A.    FDPA & Reliable Application of the Death Penalty

Schlesinger argues that the death penalty cannot be reliably applied and therefore constitutes cruel and unusual punishment in violation of the Eighth Amendment. (Doc. 260 at 19.) As just stated, in evaluating Schlesinger's individual challenges to the death penalty and the FDPA, the Court is bound by the reality that the United States Supreme Court has not found that the death penalty violates the Constitution.

#### 1.    *Risk of executing innocent persons*

The Eighth Amendment does not create an unacceptable risk of executing the innocent. Courts have uniformly rejected this argument as grounds for finding the death penalty unconstitutional.    "The terrible possibility that innocent people may be executed under a capital sentencing scheme is not new, and it has been contemplated by both Congress and the Supreme Court." *United States v. Ofomata*, No. CR 17-201, 2019 WL 527696, at *5–6 (E.D. La. Feb. 11, 2019). In *United States v. Quinones*, 313 F.3d 49 (2d Cir. 2002), the Second Circuit observed that:

> the argument that innocent people may be executed—in small or large numbers—is not new; it has been central to the centuries-old debate over both the wisdom and the constitutionality of capital punishment, and binding precedents of the Supreme Court prevent us from finding capital punishment unconstitutional based solely on a statistical or theoretical possibility that a defendant might be innocent.

. . .

> [T]he Supreme Court has upheld state and federal statutes providing for capital punishment for over two hundred years, and it has done so despite a clear recognition of the possibility that, because our judicial system—indeed, any judicial system—is fallible, innocent people might be executed and, therefore, lose any opportunity for exoneration.

*Id.* at 63, 64.

Other courts have rejected the argument that the possible execution of an innocent person renders the death penalty unconstitutional. *See, e.g.*, *United States v. Honken*, 541 F.3d 1146, 1174 (8th Cir. 2008); *United States v. Mitchell*, 502 F.3d 931, 983 (9th Cir. 2007); *Sampson*, 486 F.3d at 27–28; *United States v. Bowers*, No. CR 18-292, 2020 WL 1675916, at *1 (W.D. Pa. Apr. 6, 2020); *United States v. Con-Ui*, No. 3:CR-13-123, 2016 WL 9331115, at *7 (M.D. Pa. Jan. 28, 2016); *United States v. Sablan*, No. 1:08-CR-00259-PMP, 2014 WL 172543, at *5 (E.D. Cal. Jan. 15, 2014); *United States v. Mikos*, No. 02 CR 137-1, 2003 WL 22110948, at *16 (N.D. Ill. Sept. 11, 2003).

Several of these courts have cited *Herrera v. Collins*, 506 U.S. 390 (1993), in which the Supreme Court "squarely addressed the issue of the risk of executing the innocent." *Sampson*, 486 F.3d at 27. In *Herrera* the Court noted that "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Id.* at 400. The Court assumed without deciding that a "truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional. . . ." 506 U.S. at 417. As the First Circuit explained, however, "[t]hat is a far cry . . . from saying that the FDPA is unconstitutional." *Sampson*, 486 F.3d at 28; *see Quinones*, 313 F.3d at 68 ("*Herrera* did not suggest, much less hold, that the mere speculative possibility that one might be able to demonstrate his innocence at some point in the future renders capital punishment unconstitutional.").

In fact, "*Herrera* supports the constitutionality of the statute." *Sampson*, 486 F.3d at 28. In *Herrera*, the Supreme Court acknowledged the "unalterable fact that our judicial

system, like the human beings who administer it, is fallible," 506 U.S. at 415, but found nonetheless that a state's "refusal to entertain petitioner's newly discovered evidence eight years after his conviction" did not violate his due process rights, *id.* at 411. *Sampson*, 486 U.S. at 28; *Quinones*, 313 F.3d at 62–63; *see United States v. Montgomery*, No. 05-600201CRSJGAF, 2007 WL 1031282, at *6 (W.D. Mo. Apr. 2, 2007) ("[T]he Supreme Court in *Herrera* allowed for the continued use of the death penalty even with the inherent fallibility of the judicial system. . . .").

The risk of executing an innocent person does not render the capital punishment or the FDPA unconstitutional.

## 2. *"Death qualification" and jury instructions*

Schlesinger next argues that the process of selecting a "death-qualified" jury results in jurors who are prone to convict and to impose death sentences. (Doc. 260 at 21–25.) He also argues that capital jurors are "unable to understand and apply the instructions from each phase of a criminal trial." (*Id.* at 23.) Like other courts that have considered the matter, this Court rejects both arguments. *See, e.g.*, *United States v. Simpson*, 645 F.3d 300, 313 (5th Cir. 2011); *Bowers*, 2020 WL 1675916, at *2; *United States v. Candelario-Santana*, 368 F.Supp.3d 316, 323 (D.P.R. 2019); *Ofomata*, 2019 WL 527696, at *9–10; *United States v. Sampson*, No. CR 01-10384-MLW, 2015 WL 7962394, at *23–24, 27 (D. Mass. Dec. 2, 2015); *United States v. Ciancia*, No. 2:13-CR-00902-PSG-1, 2015 WL 13798673, at *1–2 (C.D. Cal. May 12, 2015); *Sablan*, 2014 WL 172543, at *4; *United States v. Hammer*, No. 4:96-CR-239, 2011 WL 6020164, at *3 (M.D. Pa. Dec. 1, 2011).

In *Wainwright v. Witt*, the Supreme Court held that "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" 469 U.S. 412, 424 (1985) (quoting *Adams v. Texas*, 448 U.S. 38, 45 (1980)). The Court later held "that a juror who in no case would vote for capital punishment, regardless of his or her instructions, is not an impartial juror and must be

removed for cause." *Morgan v. Illinois*, 504 U.S. 719, 728 (1992). The government cannot, however, exclude "veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968). The Supreme Court has repeatedly rejected the argument that death-qualifying potential jurors violates a defendant's constitutional rights. *See Uttecht v. Brown*, 551 U.S. 1, 19 (2007); *Buchanan v. Kentucky*, 483 U.S. 402, 414–16 (1987); *Lockhart v. McCree*, 476 U.S. 162, 173 (1986).

In support of his argument that death-qualified jurors are prone to favor the prosecution and are unable to understand jury instructions, Schlesinger relies on the social science findings that were presented to the district court in *Fell*, including findings rendered by the Capital Jury Project ("CJP"). (Doc. 160 at 23–25.) Again, such data do not provide this Court with the authority to overlook Supreme Court precedent establishing that the process of death-qualification does not violate a defendant's rights.

In both *Buchanan* and *Lockhart*, the Supreme Court was presented with statistics purporting to show that death-qualified jurors favored the prosecution. *See Buchanan*, 483 U.S. at 415 & n.16, 416 (1987) (assuming the validity of studies suggesting that death-qualified juries are more conviction-prone but nonetheless rejecting the defendant's argument that a death-qualified jury lacks impartiality); *Lockhart*, 476 U.S. at 173 ("[W]e will assume for purposes of this opinion that the studies are both methodologically valid and adequate to establish that 'death qualification' in fact produces juries somewhat more 'conviction-prone' than 'non-death-qualified' juries. We hold, nonetheless, that the Constitution does not prohibit the States from 'death qualifying' juries in capital cases.").

In addition, at least one lower court has rejected a claim where the defendant cited the same evidence presented in *Fell*. *United States v. Mills*, 388 F.Supp.3d 895, 899 (E.D. Mich. 2019) (reviewing "social science studies and empirical evidence" presented in *Fell* but noting "the Supreme Court has repeatedly held that the removal of prospective jurors for cause if their views about capital punishment would prevent or substantially impair the

performance of their duties as jurors does not violate the Constitution" and denying defendant's motion to prohibit death qualification).

Schlesinger's argument that capital juries cannot comprehend and properly apply jury instructions, based on the same studies and empirical evidence as his attack on death-qualification, also fails. "Federal courts routinely deny challenges to the comprehensibility of the FDPA as a framework for making a reasoned choice between a sentence of life without parole and death." *Ciancia*, 2015 WL 13798673, at *1 (citing *United States v. Sanders*, No. CRIM.A. 10-00351, 2014 WL 3122418, at *7 (W.D. La. July 3, 2014); *United States v. Coonce*, No. 10-3029-01-CR-S-GAF, 2014 WL 1018081, at *22 (W.D. Mo. Mar. 14, 2014); and *Sablan*, 2014 WL 172543, *4).

In *Ciancia*, the defendant alleged that the FDPA "fails to provide a structure that permits a reasoned choice between a sentence of life in prison without the possibility of release and execution." *Id.* at *1 (citation omitted). He argued that studies based on interviews with capital jurors collected by the CJP "bely[ ] the operating assumptions about jurors' capabilities and ordinary practices," and "prove that FDPA jury instructions, and the overarching scheme that produced them, are inherently unfathomable to jurors." *Id.* (citations omitted). In *Hammer*, likewise, the defendant cited studies conducted by the CJP to support his claim that "the death penalty sentencing scheme creates an unreasonable risk that jurors will misunderstand their proper role in violation of the Eighth Amendment and the Due Process Clause." 2011 WL 6020164, at *2.

In each case, the court rejected the defendant's argument. *Ciancia*, 2015 WL 13798673, at *1–2; *Hammer*, 2011 WL 6020164, at *3. Both courts cited *United States v. Llera Plaza*, 179 F.Supp.2d 444, 449–50 (E.D. Pa. 2001). In *Llera Plaza*, the court explained that "there is nothing in the FDPA that can be said to raise an insuperable barrier to informed sentencing. To the extent that aggravating and mitigating factors are abstract concepts, they are capable of being rendered precise and concrete in the course of crafting instructions to the sentencing jury." 179 F.Supp.2d at 449–50; *see United States v. Taylor*,

635 F. Supp.2d 1243, 1247–48 (D.N.M. 2009); *United States v. Candelario-Santana*, 368 F. Supp.3d 316, 323 (D.P.R. 2019); *Ofomata*, 2019 WL 527696, at *4.

Neither death qualification of jurors nor the alleged incomprehensibility of the jury instructions renders the death penalty or the FDPA unconstitutional.

### B.    The Death Penalty under the FDPA is not Arbitrary or Capricious

Schlesinger argues that the death penalty, including the death penalty as administered under the FDPA, is imposed in an arbitrary and capricious manner in violation of the Eighth Amendment. (Doc. 260 at 38–103.) He contends that the arbitrary quality of the death penalty is demonstrated by the rarity of its imposition and by its uneven application arising from regional, racial, and gender biases. These arguments fail.

Schlesinger relies principally on *Furman v. Georgia*, 408 U.S. 238 (1972) (per curiam), where the Supreme Court held that sentences imposed under the death penalty statutes in Georgia and Texas constituted cruel and unusual punishment because the statutes provided "no standards [to] govern the selection of the penalty." *Id.* at 253. Subsequently, in *Gregg*, the Court explained that "*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." 428 U.S. at 189. The Court emphasized that the "concerns expressed in *Furman* . . . can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." *Id.* at 195.

### 1.    Rarity of imposition

Schlesinger contends that the unconstitutional arbitrariness of the death penalty under the FDPA is manifest in the fact that "only a handful of federal defendants who are potentially eligible for capital punishment are ever targeted." (Doc. 260 at 46.) Courts have consistently rejected this argument. *See Aquart*, 912 F.3d at 54–57; *Mitchell*, 502 F.3d at

983; *Sampson*, 486 F.3d at 23–24; *Mills*, 393 F.Supp.3d at 679–8; *Ofomata*, 2019 WL 527696, at *2; *Candelario-Santana*, 368 F.Supp.3d at 320–22; *Con-Ui*, 2016 WL 9331115, at *4–5.

In *Sampson*, the defendant alleged that "because the federal death penalty is infrequently sought and even more infrequently carried out, its imposition is arbitrary, capricious, and therefore unconstitutional." 486 F.3d. at 23. The First Circuit rejected the argument:

> This argument mistakes the nature of the arbitrariness concern in the Supreme Court's jurisprudence. In the thirty-four years since *Furman* was decided, the Court has made clear that its decision was not based on the frequency with which the death penalty was sought or imposed. Rather, the primary emphasis of the Court's death penalty jurisprudence has been the requirement that the discretion exercised by juries be guided so as to limit the potential for arbitrariness.

*Id.* at 23–24.

The court explained that under *Furman* and *Gregg*, a "capital sentencing system must: (1) rationally narrow the class of death-eligible defendants; and (2) permit a jury to render a reasoned, individualized sentencing determination based on a death-eligible defendant's record, personal characteristics, and the circumstances of his crime." *Id.* at 24 (quoting *Kansas v. Marsh*, 548 U.S. 163, 173–74 (2006)). As the Second Circuit observed, rejecting a similar challenge to the FDPA, "[w]here such safeguards are provided, no constitutional concern arises from the resulting infrequency with which federal juries vote a death sentence for crimes of intentional murder." *Aquart*, 912 F.3d at 55.

In support of his argument that the death penalty is administered arbitrarily under the FDPA, Schlesinger provides a "sampling of the range of outcomes in federal capital cases" together with a link to the verdict sheets "of virtually all completed federal death penalty prosecutions." (Doc. 260 at 57 & n.41.) This information is insufficient to prove arbitrariness.

"The Supreme Court [has] . . . rejected efforts 'to prove a constitutional violation by demonstrating that other defendants who may be similarly situated did not receive the

death penalty,' reasoning that [t]he Constitution is not offended by inconsistency in results based on the objective circumstances of the crime.'" *United States v. Ciancia*, No. CR13-902 PSG, 2015 WL 13798659, at *3 (C.D. Cal. May 15, 2015) (quoting *McCleskey*, 481 U.S. at 307 & 307 n.28); *see Sampson*, 486 F.3d at 25 (explaining that general summaries of other cases are "wholly inadequate to prove that the death penalty has been imposed in an arbitrary manner"). In *McCleskey* the Court explained that "[n]umerous legitimate factors may influence the outcome of a trial and a defendant's ultimate sentence, even though they may be irrelevant to his actual guilt," including the strength of the evidence and witness availability, credibility, and memory. 481 U.S. at 307 n.28; *see United States v. George*, No. CR 17-201, 2020 WL 8881620, at *2 (E.D. La. Apr. 27, 2020). Other courts have rejected the argument that summaries "demonstrat[ing] the varying outcome among cases" are sufficient to show that the federal death penalty is imposed arbitrarily. *Con-Ui*, 2016 WL 9331115, at *5 (citing *Sablan*, 2014 WL 172543, at *4, and *United States v. Williams*, No. 4:08-CR-00070, 2013 WL 1335599, at *18 (M.D. Pa. Mar. 29, 2013)). In *Candelario-Santana*, the court was provided with the same information offered by Schlesinger: case summaries and a link to verdict sheets. 368 F.Supp.3d at 320–21. Citing *Sampson*, 486 F.3d at 25, the court rejected the argument that such information demonstrated arbitrary administration of the federal death penalty. 368 F.Supp.3d at 320–21.

The evidence cited by Schlesinger is insufficient to demonstrate that the death penalty is imposed arbitrarily under the FDPA. *See McCleskey*, 481 U.S. at 307 & 307 n.28.

### 2.    *Geographic, race, and gender bias*

Schlesinger alleges that the arbitrary nature of the federal death penalty is demonstrated by regional disparities, by the targeting of males and minorities, and by the "white-victim effect" and the "white-female-victim effect." (Doc. 260 at 84.) In response, the Government first notes that Schlesinger is white while his victim was an African

American male. (Doc. 322 at 16.) The Government also notes that Arizona is not one of the Southern "death belt" states cited by Schlesinger. (*Id.* at 20.)

In *Mills* the district court for the Eastern District of Michigan rejected as "meritless" an argument identical to that raised by Schlesinger: "that the federal death penalty is unconstitutional in violation of the Fifth and Eighth Amendments—because minority defendants, defendants suspected of killing white females, and defendants from southern states are disproportionately more likely to receive death sentences." 393 F.Supp.3d at 681. The court first noted that "Defendants do not argue that their race, the geographic location of this prosecution, or the race or gender of their alleged victims were considerations in deciding to seek the death penalty against them." *Id.* Schlesinger likewise does not argue that his race, his victim's race, or the location of his prosecution were factors in the Government's decision to seek the death penalty against him.

In support of his broad allegations of geographic, racial, and gender disparity, Schlesinger has assembled data and opinions from a number of secondary sources, including newspaper and law review articles, various social science studies, expert testimony from the *Fell* hearing, comments by politicians, and a survey completed in 2000 by the Department of Justice ("DOJ"). (Doc. 260 at 68–86, 96–102.) As the district court explained in *Mills*, however, "the use of such a generalized statistical disparity, without evidence of its applicability to Defendants, was foreclosed by the Supreme Court in *McCleskey v. Kemp*." 393 F.Supp.3d at 681.

In *McCleskey* the Supreme Court rejected the defendant's Fifth and Eighth Amendment arguments against the death penalty. The Court was presented with a study similar to the 2000 DOJ report relied on by Schlesinger. The study encompassed more than 2,000 murder cases in Georgia that occurred in the 1970s. It found that the likelihood of a defendant being charged with a capital offense and/or receiving the death penalty varied according to the race of the defendant and the victim. The study ultimately concluded that black defendants who killed white victims had the greatest likelihood of receiving the death penalty. 481 U.S. at 286–87.

The Court held that systemic statistics reflecting the application of the death penalty within a given scheme to different races cannot, without more, support a finding of discriminatory intent sufficient to strike down that death penalty scheme on equal protection grounds. *Id.* Instead, "a defendant who alleges an equal protection violation has the burden of proving 'the existence of purposeful discrimination'" and "must prove that the decisionmakers in his case acted with discriminatory purpose." *Id.* at 292; *see Mills*, 393 F.Supp.3d at 681.

Courts applying *McCleskey* have found that the 2000 DOJ report is insufficient to prove discrimination. *See Sampson*, 486 F.3d at 26 (citing the DOJ report and explaining that "[b]are statistical discrepancies are insufficient to prove a Fifth Amendment violation with respect to the implementation of a statute"); *Candelario-Santana*, 368 F.Supp.3d at 321–22; *United States v. Sablan*, No. 00-CR-00531-WYD, 2006 WL 1028780, at *12 (D. Colo. Apr. 18, 2006) (finding DOR report "flawed" because it "does not provide information concerning what percentage of individuals committing death eligible offenses are minorities or whether individuals 'similarly situated . . . have not been capitally-prosecuted in other federal districts.'") (quoting *United States v. Sampson*, 275 F.Supp.2d 49, 90 (D. Mass. 2003)); *United States v. Williams*, No. S100CR.1008(NRB), 2004 WL 2980027, at *7 (S.D.N.Y. Dec. 22, 2004) ("[Defendants] have offered only the DOJ Report, which is a systemic report that addresses FDP administration as a whole, not defendant's particular case. Under *McCleskey,* such evidence is not sufficient to show the requisite discriminatory intent.") *aff'd*, 506 F.3d 151 (2d Cir. 2007); *United States v. Bin Laden*, 126 F.Supp.2d 256, 263 (S.D.N.Y. 2000) (explaining that the 2000 DOJ Study failed to show a "constitutionally unacceptable risk that geography plays an inappropriate role in federal capital decision-making").

In *Mills* the court "[a]ssumed without deciding that Defendants ha[d] standing to raise claims premised on gender-based and geographical disparities," but concluded that their "challenge under the implicit Equal Protection Clause in the Fifth Amendment fails because they have not presented any specific evidence of purposeful discrimination against

- 14 -

themselves or those southern and minority defendants upon whom they purport to base their claim." 393 F.Supp.3d at 681. Schlesinger's allegations suffer from the same flaw. He makes no argument that in his case the prosecutors acted with purposeful discrimination. *See Bowers*, 2020 WL 1675916, at *3 (denying claim where "Defendant does not argue that his race, the geographic location of th[e] prosecution, or the race or gender of the alleged victims were considerations in the Government's determination to seek the death penalty against him").

The *McCleskey* Court likewise rejected the defendant's Eighth Amendment claims, which were based on statistical studies indicating race-based discrepancies in capital sentencing. The Court concluded:

> At most, the . . . study indicates a discrepancy that appears to correlate with race. Apparent disparities in sentencing are an inevitable part of our criminal justice system. . . . Despite these imperfections, our consistent rule has been that constitutional guarantees are met when "the mode [for determining guilt or punishment] itself has been surrounded with safeguards to make it as fair as possible." Where the discretion that is fundamental to our criminal process is involved, we decline to assume that what is unexplained is invidious.

*McCleskey*, 481 U.S. at 312–13 (citation omitted); *see Aquart*, 912 F.3d at 56; *See Sampson*, 486 F.3d at 26–27 ("The DOJ study provides no basis for attributing the statistical discrepancies with respect to geography and race in FDPA prosecutions to discrimination rather than to other factors, such as differences in the nature of the crimes involved."); *Bowers*, 2020 WL 1675916, at *3; *George*, 2020 WL 8881620, at *2–5; *Candelario-Santana*, 368 F.Supp.3d at 321–22; *Ofomata*, 2019 WL 527696, at *3. As the court in *Mills* explained, "Defendants' Eighth Amendment claim similarly fails because they have not articulated that the discrepancies that appear to correlate with race, region, and gender are caused by something invidious rather than the discretion given to juries and judges under the FDPA." *Mills*, 393 F.Supp.3d at 682.

Neither the rarity of its imposition not its alleged biases render the death penalty or its administration under the FDPA arbitrary or capricious.

### C.     Prosecutorial Discretion

Schlesinger argues that a federal prosecutor's "discretion to charge a capital offense, seek death, accept or reject a plea deal, and charge aggravators" is another cause of the FDPA's arbitrariness. (Doc. 260 at 103.) This argument fails. Schlesinger cites no authority for the proposition that prosecutorial discretion renders the FDPA unconstitutional.

First "claims that prosecutorial discretion to seek the death penalty renders it unconstitutional" have been rejected by the Ninth Circuit and the Supreme Court. *Boyer v. Chappell*, 793 F.3d 1092, 1105 (9th Cir. 2015) (citing *Gregg*, 428 U.S. at 199, and *Proffitt v. Florida*, 428 U.S. 242, 254 (1976)). In *Mitchell*, an FDPA case, the Ninth Circuit held that such claims are "foreclosed." 502 F.3d at 982.

Next, in the context of the FDPA, the prosecutor's discretion is limited. As courts considering these claims have explained, "[t]o the extent that there may be an independent constitutional concern as to the decisional process by which the government decides if it will seek the death penalty, that process contains numerous safeguards built into an articulated death penalty protocol." *Sampson*, 486 F.3d at 24 (citing United States Attorneys' Manual ("J.M.") § 9–10.000); *see Bowers*, 2020 WL 1675916, at *3 (citing the Manual, §§ 9-10.000 to 9-10.200,[3] and explaining that "contrary to the Defendant's arguments, prosecutorial discretion is limited by the FDPA and is guided by safeguards set forth in a formal Protocol in selecting cases for capital prosecution."); *United States v. Taylor*, 648 F.Supp.2d 1237, 1241 (D.N.M. 2008) (noting that federal prosecutorial discretion "is limited and guided by the requirements of the FDPA's scheme"); *United States v. Henderson*, 485 F.Supp.2d 831, 860–61 (citing Manual and describing "lengthy decision-making process" involved in "deciding whether it is appropriate to seek the death penalty").

---

[3] According to that protocol, for example, "[a]rbitrary or impermissible facts—such as a defendant's race, ethnicity, or religion—will not inform any stage of the decision-making process." J.M. § 9-10.030. "[B]ias for or against an individual based upon characteristics such as race or ethnic origin play no role in any recommendation or decision as to whether to seek the death penalty." J.M. § 9.10.140A.

In *Bowers*, the court further noted that "the Defendant has failed to show that the Government employed or considered any discriminatory reason for prosecuting him as a capital defendant." 2020 WL 1675916, at \*3. Schlesinger likewise has not shown the Government is prosecuting him for discriminatory reasons.

The exercise of prosecutorial discretion does not render the FDPA arbitrary and capricious.

### D.   Delays in Imposition of Death Penalty

Schlesinger alleges that the "inherent and necessary delays" that occur before a prisoner is executed violate the Eighth Amendment. (Doc. 260 at 110.) He contends that the period a prisoner spends in "solitary confinement waiting for an execution that may never come" constitute a second cruel and unusual punishment. (*Id.* at 111.) Finally, he argues that the long delays before execution eliminate the deterrent or retributive value of capital punishment. (*Id.* at 116–24.) This claim will be denied.

First, as the Government notes (Doc. 322 at 27 n.9), to the extent Schlesinger alleges that his execution will be unduly delayed, the claim is not ripe. He has not been found guilty, let alone sentenced to death. *See Sampson*, 2015 WL 7962394, at \*30.

Next, his claim that undue delay renders the FDPA unconstitutional is unsupported by any binding authority. "The Supreme Court has never held that execution after a long tenure on death row is cruel and unusual punishment." *Allen v. Ornoski*, 435 F.3d 946, 958 (9th Cir. 2006); *see Thompson v. Sec'y for Dep't of Corr.*, 517 F.3d 1279, 1284 (11th Cir. 2008) (noting "the total absence of Supreme Court precedent that a prolonged stay on death row violates the Eighth Amendment guarantee against cruel and unusual punishment" and holding that execution after 31 years not unconstitutional); *see also Lackey v. Texas*, 514 U.S. 1045 (1995) (mem.) (Stevens, J. & Breyer, J., discussing denial of certiorari and noting the claim has not been addressed); *Thompson v. McNeil*, 556 U.S. 1114 (2009) (mem.) (Stevens, J. & Breyer, J., dissenting from denial of certiorari; Thomas, J., concurring, discussing *Lackey* issue); *see also Knight v. Florida*, 528 U.S. 990 (1999) (Thomas, J., concurring in denial of certiorari) ("I am unaware of any support in the

American constitutional tradition or in this Court's precedent for the proposition that a defendant can avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed.").

Circuit courts, including the Ninth Circuit, have consistently held that prolonged incarceration under a sentence of death does not violate the Eighth Amendment. *See Smith v. Mahoney*, 611 F.3d 978, 998 (9th Cir. 2010); *McKenzie v. Day*, 57 F.3d 1493, 1493–94 (9th Cir. 1995) (en banc); *Chambers v. Bowersox*, 157 F.3d 560, 570 (8th Cir. 1998); *White v. Johnson*, 79 F.3d 432, 439 (5th Cir. 1996); *Stafford v. Ward*, 59 F.3d 1025, 1028 (10th Cir. 1995).

Schlesinger's arguments about the cruelty of solitary confinement and the effects of lengthy delay on the deterrent and retributive goals of capital punishment rely on dissenting opinions and a variety of secondary sources. Again, this information does not constitute binding authority. *See, e.g.*, *Ruiz v. Davis*, No. SA-17-CA-100-OLG, 2017 WL 1962758, at *2 (W.D. Tex. Feb. 14, 2017) ("The opinions of individual Justices dissenting from the denial of certiorari review by the Supreme Court do not constitute legal authority binding on this or any other court.").

Delays in its imposition do not render the death penalty unconstitutional.

### E.  Evolving Standards of Decency

Schlesinger contends that the death penalty violates the Eighth Amendment because "the evolving standards of decency that mark the progress of our nation's maturation as a society have relegated capital punishment to history." (Doc. 260 at 124.) In support of this argument Schlesinger asserts that the majority of states do not carry out executions and the majority of Americans no longer support capital punishment. (*Id.*) He also relies on Justice Breyer's *Glossip* dissent, 576 U.S. at 938–48, which argued that the death penalty has become "unusual" as indicated by various historical developments. (*Id.* at 125–36.) Statistics and a dissenting opinion are not sufficient grounds for this Court to issue a ruling which is contrary to Supreme Court precedent.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments."

U.S. Const. amend. VIII. This clause "is not fastened to the obsolete," rather, its meaning is drawn from "the evolving standards of decency that mark the progress of a maturing society." *Moore v. Texas*, 137 S. Ct. 1039, 1048 (2017) (quoting *Hall v. Florida*, 572 U.S. 701, 708 (2014)). "The question is whether the societal standards of decency have evolved to that point that this Court can conclude that the death penalty is per se cruel and unusual punishment." *Mills*, 393 F.Supp.3d at 682. In a series of recent decisions, courts have held, "[b]ased on Supreme Court precedent," that standards of decency have not so evolved. *Id.*; *see United States v. Arnold*, 412 F.Supp.3d 732, 739 (E.D. Mich. 2019) (rejecting same arguments raised by Schlesinger and citing *Kansas v. Carr*, 577 U.S. 108 (2016), and *Hurst v. Florida*, 577 U.S. 92 (2016)); *Bowers*, 2020 WL 1675916, at *4 (citing *Bucklew v. Precythe*, 139 S. Ct. 1112, 1122 (2019); *Glossip*, 576 U.S. at 869; *Baze v. Rees*, 553 U.S. 35, 47 (2008); and *Gregg*, 428 U.S. 153); *Candelario-Santana*, 368 F.Supp.3d at 322 (citing *Chapman v. United States*, 500 U.S. 453 (1991), and *Roberts v. Louisiana*, 428 U.S. 325 (1976)). Finally, the district court in *Fell*, following the evidentiary hearing, concluded that while "[p]ublic opinion is turning against the death penalty and state legislatures have done so as well," . . . "[t]he record in this case does not support a view that the country has achieved consensus on the desirability of abolishing the death penalty." 224 F. Supp. 3d at 356.

Courts evaluating these claims have recognized that they are "bound by Supreme Court precedent." *Mills*, 393 F.Supp.3d at 682; *Candelario-Santana*, 368 F.Supp.3d at 322; *Ofomata*, 2019 WL 527696, at *5. In *Mitchell*, the Ninth Circuit found "unavailing" the defendant's argument "that capital punishment is incompatible with society's values or otherwise categorically violates the Eighth Amendment." 502 F.3d at 982. The court explained:

> Whether contemporary values dictate a different answer today is for the Supreme Court to decide; the Eighth Amendment does not authorize this court to overrule Supreme Court precedent "even where subsequent decisions or factual developments may appear to have significantly undermined the rationale for [an] earlier holding."

*Id.* (quoting *Roper v. Simmons*, 543 U.S. 551, 594 (2005) (O'Connor, J., dissenting) (internal quotations and citation omitted)); *see Aquart*, 912 F.3d at 49 ("Whatever the merits of Aquart's argument, only the Supreme Court can overrule *Gregg* or recognize exceptions thereto."); *United States v. Robinson*, 367 F.3d 278, 291 (5th Cir. 2004). *Mitchell* alone "forecloses" relief on this claim. *United States v. Smith*, No. 3:16-CR-00086-SLG-1, 2019 WL 11863731, at *2 (D. Alaska Apr. 22, 2019).

Applying binding Supreme Court precedent, the Court finds that the death penalty is not unconstitutional under society's evolving standards of decency.

### F.   Evidentiary hearing

Schlesinger asks the Court to grant an evidentiary hearing where he can present expert testimony in support of his arguments.[4] That request will be denied. There are no material facts at issue whose resolution would entitle Schlesinger to relief. Testimony is not needed for the Court to resolve the claims raised by Schlesinger, each of which, as demonstrated above, fails as a matter of law. *See United States v. Ciancia*, No. 2:13-CR-00902-PSG-1, 2015 WL 13798672, at *2 (C.D. Cal. May 12, 2015) ("Because Defendant provides no basis to overturn settled precedent that the FDPA passes federal constitutional muster, an evidentiary hearing concerning his experts and data is unnecessary."); *Taylor*, 635 F.Supp.2d at 1244 (finding that an evidentiary hearing on defendant's claim that the FDPA is incomprehensible to jurors and leads to arbitrary application of the death penalty "would not be helpful"); *Williams*, 2013 WL 1335599, at *18; *see also Sablan*, 2014 WL 172543 at *4; *United States v. Gooch*, No. CRIM.A. 04-128-23, 2006 WL 3780781, at *31 (D.D.C. Dec. 20, 2006).

## IV.   CONCLUSION

Schlesinger asserts that "the doctrine of stare decisis does not limit this Court's action." (Doc. 260 at 138.) The Court disagrees and "declines to depart from settled law holding the death penalty constitutional." *United States v. Martinez*, No. 1:18-CR-123-2

---

[4] In his reply brief Schlesinger asks the Court to defer an evidentiary hearing until next year given the possibility that the DOJ will withdraw its Notice. (Doc. 344 at 9–10.)

1   (RDA), 2021 WL 1784614, at *13 (E.D. Va. May 5, 2021) (citing *Ramos v. Louisiana*, 140

2   S. Ct. 1390, 1416 n.5 (2020) (Kavanaugh, J., concurring) ("[V]ertical *stare decisis* is

3   absolute, as it must be in a hierarchical system with 'one supreme Court.'") (additional

4   quote omitted).

5         Schlesinger's challenges to the death penalty and the FDPA have all been

6   considered and rejected by numerous courts, including the United States Supreme Court.

7   "[I]t is settled that capital punishment is constitutional," *Glossip*, 576 U.S. at 869, and

8   courts have universally affirmed the constitutionality of the FDPA.

9         Accordingly, for the reasons set for above,

10         **IT IS HEREBY ORDERED denying** Schlesinger's Motion to Strike the Death

11   Penalty. (Doc. 260.)

12         Dated this 29th day of November, 2021.

Honorable Raner C. Collins
Senior United States District Judge

- 21 -