GARY M. RESTAINO
U.S. Attorney
District of Arizona
SARAH B. HOUSTON
Arizona State Bar No. 026691
SHELLEY K.G. CLEMENS
JANE L. WESTBY
Arizona State Bar No. 017550
Assistant U.S. Attorneys
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
Email: sarah.houston@usdoj.gov
        jane.westby@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>                    Plaintiff,<br><br>          vs.<br><br>Ryan Phillip Schlesinger,<br><br><br>                    Defendant. | CR 18-02719-TUC-RCC (BGM)<br><br><br>NOTICE OF AND MOTION TO ADMIT INEXTRICABLY INTERTWINED EVIDENCE, AND ALTERNATIVELY RULE 404(B) EVIDENCE |

The United States of America, by and through undersigned counsel, respectfully submits this motion to admit inextricably intertwined evidence and, alternatively, Rule 404(b) evidence during the guilt phase of trial in this matter. The United States intends to introduce evidence of Defendant's hostile and threatening acts towards law enforcement and the chain of events that led up to the murder, attempted murders, and assaults. This motion is supported by the following memorandum of points and authorities and all matters

of record. The government requests that it be allowed to supplement this motion once

Defendant files any expert notice or discovery, if any, related to Defendant's mental state.

## I.      Facts Of The Charged Offenses

### A.      On November 29, 2018, Defendant Murdered USMS Deputy C.W. and Attempted to Murder and Assaulted Other USMS Task Force Members while the Task Force Was Attempting to Arrest Defendant for Stalking a TPD Officer.

On the afternoon of November 29, 2018, United States Marshal Service (USMS)

Violent Offender Task Force ("task force") members attempted to arrest Defendant Ryan

Schlesinger (Defendant) at his residence on N. 15th Avenue in Tucson, Arizona.[1]  The day

before, on November 28, 2018, Tucson Police Department (TPD) Detective Irma Estrada

obtained a felony arrest warrant for Defendant for stalking TPD Sergeant Amber Kingman,

in violation of Arizona Revised Statutes § 13-2923(A)(1). (Bates No. 604, 3341, 4164.)  It

was decided that because the stalking victim was a TPD Sergeant, the USMS task force

would execute the warrant.[2]

The task force members were advised that Defendant did not have a car and wanted

to conduct an "open air arrest" if he was spotted outside his house.   After watching

Defendant's house for several hours with no movement observed inside or outside the

---

[1] The task force derives its authority from the Presidential Threat Protection Act of 2000 (PL 106-544) which directed USMS to direct and coordinate regional fugitive task forces consisting of federal, state, and local law enforcement for the purpose of apprehending fugitives.

[2] Early in the afternoon of November 29, 2018, USMS Deputy N.B. briefed the task force about the warrant for Defendant and gave a brief summary of the underlying facts. USMS task force members also received information that Defendant had recently been involuntarily committed for a mental health evaluation, had been in possession of a firearm, had resisted arrest, and had made multiple threats against TPD officers.

residence, task force members decided to use a ruse to determine if Defendant was home. USMS Deputy Chris Shuman, posing as an intoxicated person in plain clothes, wandered in front of Defendant's residence.  He opened and closed the mailbox, and threw a plastic bottle into the front yard.  A man inside the house yelled at USMS Deputy Shuman to go away through a front window on the northwest (far left side) of the house.  Deputy Marshal Shuman was able to see a profile through the window and identified that person as Defendant.

At approximately 5:00 p.m., members of the task force announced their presence and attempted to call Defendant out of his residence.  This involved an armored vehicle (Suburban), white sprinter van, and another SUV.  Although the vehicles were unmarked, emergency lights were in use.  In addition to the vehicles at the front of the house, other task force members were at the rear of the house to ensure that no one could leave or enter the house without being seen.  All members of the team were in tactical gear including ballistic vests.  All of the vests said "POLICE" in large all black letters or were otherwise marked as law enforcement.

USMS Deputy Ricardo Manriquez and Task Force Officer (TFO) Martin Renteria, in the armored vehicle, used a loudspeaker and stated, "Police, Ryan Schlesinger, we have a warrant for your arrest.  Come out with your hands up.  U.S. Marshals.  Police.  The house is surrounded.  Come out now."  In between the announcements, USMS Deputy Manriquez would activate the police siren.  As this was happening, task force members approached the front of the home and disabled a surveillance camera above the front door

on the west side of the house.   USMS Deputy Manriquez repeated variations of his announcement more than a dozen times.   When there was no response, task force members approached the home.

Initially, TFO R.Z. tried to break a front window using a beanbag shotgun.   (Bates No. 3941.)   However, the beanbag did not break the window because the window was covered in a protective film.   They decided to try breaching a different window on the north side of the house using a "Reaper" tool.   As the task force members approached the window, they were in a loose "stack" meaning that they were in a line behind a shield. USMS Deputy B.P. provided cover with a shield, USMS Deputy N.B. and TFO H.G.[3] provided lethal cover with guns drawn, and USMS Deputy C.W. approached the window with the Reaper breaching tool.   TFO R.Z.[4] also provided cover from a position along the wall of the house just to the west of the other four task force members.

USMS Deputy C.W. tried to break the window but could not get a solid hit because of the burglary bars.   He swapped the Reaper breaching tool with Deputy Marshal N.B., and Deputy Marshal N.B. used the tool to pry off the burglary bars.   Deputy Marshal N.B. then swapped again with Deputy Marshal C.W. so that Deputy Marshal C.W. could again attempt to breach the window while Deputy Marshal N.B. provided lethal cover.

As USMS Deputy C.W. used the Reaper tool to breach the window, Defendant fired shots from inside the home through the window.   The shots fired from inside the residence

---

[3] TFO H.G. is a probation officer with Pima County Adult Probation.

[4] TFO R.Z. is an officer with the Arizona Department of Corrections.

4

penetrated through the window blinds and window.  USMS Deputy C.W was shot twice in the upper left chest, just below his neck.  USMS Deputies B.P. and N.B. returned fire. (Bates No. 3941.)  TFO H.G. was in the stack.  (Bates No. 3941.)

TFO H.G. and USMS Deputy N.B. dragged USMS Deputy C.W. towards the armored vehicle.  USMS Deputy Shuman took Deputy C.W.'s vest off and saw gunshot wounds on Deputy C.W.'s right arm and near his right armpit.  Deputy Shuman, who was a certified combat lifesaver in the U.S. Army, began providing first aid as Deputy C.W. was loaded into the armored vehicle.  Deputy Shuman attempted to plug the wounds with his own fingers to stop the bleeding, grabbed Deputy C.W. by his belt, and lifted him into the backseat of the armored vehicle.

USMS Deputy Manriquez drove the armored vehicle to the hospital, while Deputy Shuman continued to try to treat Deputy C.W. in the backseat.  Deputy C.W. stopped breathing and had no pulse within approximately two minutes of leaving the scene.  At the hospital, the trauma team determined that Deputy C.W. had no vitals and immediately began performing chest compressions as they took him to a trauma room.  USMS Deputy C.W. was pronounced dead at 6:07 p.m., approximately 40 minutes after he was shot by Defendant.

After Defendant shot USMS Deputy C.W., Defendant remained inside the house. While it is unclear what Defendant did between 5:30 p.m. and 6:23 p.m., at one point, Defendant made several phone calls to his father and a portion of one of those calls was recorded on his laptop.  The recording begins at 5:49 p.m., approximately 19 minutes after

5

the shooting.  The video camera was between the blinds and the windowpane.  Because it was dark, very little can be seen.  However, the audio is better quality and Defendant can be heard speaking to his father.

In the recorded conversation, Defendant explained that because the police attempted to breach his property, he "had every right to shoot back."  He said that he did not know if one of them was shot but that they broke a window and "he fired in defense."  Defendant told his father, "[t]he police tried to breach.  We're in a standoff now.  Or the terrorist police, I should say."  Defendant also asked his dad to get his mother to call an attorney at a phone number that he provided.  During the phone call, Defendant sounded relatively calm and is coherent.  The recording ends at approximately 6:17 p.m. while the phone call is on-going.  Defendant surrendered about 6 minutes after the recording ended.

**B.    The Superseding Indictment**

On September 30, 2020, a federal grand jury returned a superseding indictment (Dkt. No. 192) charging Defendant as follows:  Count 1, First Degree Murder of USMS Deputy Marshal C.W., in violation of 18 U.S.C. §§ 1111(a) and 1114;  Counts 2–4, Attempted Murder of USMS Deputy Marshals N.B., B.P., and Special Deputy Marshal H.G., in violation of 18 U.S.C. §§ 1113 and 1114; Counts 5–8, Assault on USMS Special Deputy Marshals R.Z. and H.G., and Deputy Marshals, N.B. and B.P., with a Deadly or Dangerous weapon, in violation of 18 U.S.C. §§ 111(a)(1) & (b); Count 9, Using a Firearm During and in Relation to a Crime of Violence Causing Death for the Murder of USMS Deputy Marshal C.W., in violation of 18 U.S.C. §§ 924(c)(1)(A) and (j); Counts 10–13,

Using a Firearm During and in Relation to a Crime of Violence for the attempted murder of USMS Deputy Marshal N.B., B.P., and Special Deputy Marshal H.G. and the Assault on USMS Special Deputy Marshal R.Z., with a Deadly and Dangerous Weapon, in violation of Title 18 U.S.C. §§ 924(c)(1)(A)(i), (ii), and (iii).

## II. The Evidence Is Admissible As Either "Inextricably Intertwined" Or Non-Propensity "Other Acts" Evidence.

The United States intends to introduce evidence of Defendant's hostile and threatening acts towards law enforcement and the chain of events that led up to the murder. It would be impossible to explain why Defendant shot at the victims without presenting evidence of the events and Defendant's threats that preceded the crimes. This evidence is not "other acts" evidence under Rule 404(b) because it is inextricably intertwined with the charged murder, attempted murders, and assaults. Even if the evidence at issue were "other acts," it is admissible under Rule 404(b)(2) for a number of non-character purposes, including to prove the defendant's motive, intent, preparation, plan, and knowledge. For either and both reasons, this Court should admit the evidence.

### A. Legal Standard

Rule 404(b) governs the admission of "[e]vidence of any other crime, wrong, or act." This rule, however, does not apply to evidence that is "inextricably intertwined" with the underlying offense. *United States v. Carpenter*, 923 F.3d 1172, 1181 (9th Cir. 2019). Instead, intrinsic "other acts" evidence is not character evidence at all, but is instead "direct evidence, used to flesh out the circumstances surrounding the crime with which the defendant has been charged, thereby allowing the jury to make sense of the testimony in

its proper context." *United States v. Ramirez–Jiminez*, 967 F.2d 1321, 1327 (9th Cir. 1992) (internal quotation marks omitted). Intrinsic evidence falls into two categories: (1) "evidence that constitutes a part of the transaction that serves as a basis for the criminal charge," or (2) is "necessary in order to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." *Carpenter*, 923 F.3d at 1181 (internal alterations and quotation marks omitted).

Even when evidence does fall under Rule 404(b), it prohibits only "[e]vidence of any other crime, wrong, or act" that is offered "to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). Such evidence, however, "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). A district judge is "accorded wide discretion" in deciding whether to admit Rule 404(b) evidence. *United States v. Hadley*, 918 F.2d 848, 850 (9th Cir. 1990). This "is a rule of inclusion—not exclusion." *United States v. Lague*, 971 F.3d 1032, 1040 (9th Cir. 2020), cert. denied, 141 S. Ct. 1695 (2021). Evidence of prior criminal conduct may be admitted under Rule 404(b) if: "(1) the evidence tends to prove a material point; (2) the other act is not too remote in time; (3) the evidence is sufficient to support a finding that defendant committed the other act; and (4) (in certain cases) the act is similar to the offense charged." *Id.* at 1038. Although the government has the burden, it "need only lay a factual foundation from which a jury could reasonably conclude that the defendant committed the allegedly-similar bad acts, and that he possessed

8

the requisite intent in committing those bad acts." *Id.* at 1040 (internal alterations and quotation marks omitted).

As explained below, the history of the defendant's threatening behavior is admissible as both intrinsically intertwined and prior acts pursuant to Rule 404(b).

**B. <u>Description of Inextricably Intertwined Evidence</u>**

**1. August 18, 2017, TPD Response to Defendant's Residence.**

In August, 2017, a threat by Defendant against a Pima Community College (PCC) employee resulted in an involuntary mental health evaluation order being issued for Defendant. Leading up to the mental health evaluation order, Defendant had written a letter to the PCC President, in which Defendant threatened a PCC Code of Conduct Officer, writing that, "[b]ut as far as mental health goes, Ms. [B] is suicidal. That bitch tries to go to war with me....well that means she is suicidal, You heard of suicide of cop, well Ms. [B] trying to commit suicide by student or ex-student I should say." (Bates No. 3121, 3124.)

On August 18, 2017, TPD Mental Health Support Team (MHST) member Officer Dustin Dial, along with TPD Officer Porras and Sergeant Kingman, went to Defendant's house to transport him to the Crisis Response Center for an involuntary emergency mental health evaluation.[5] (Bates No. 3124.) When Officer Dial told Defendant about the emergency mental health petition, Defendant told Officer Dial, "[n]o, I'm not fucking going anywhere," and "get the fuck out of my house!" (Bates No. 3125.) Defendant then

---

[5] The MHST is the Mental Health Support Team. It consists of TPD officers trained to work with individuals with mental health issues. They are in part responsible for obtaining mental health orders.

stood, clenched his fists, and screamed obscenities. Given his aggressive stance and volatile demeanor, Sergeant Kingman and Officer Porras entered the home. Officer Dial explained that Defendant would be going to a hospital, not the jail. Defendant wildly flailed his arms, continued to scream, and ran into a bedroom. The officers followed. (Bates No. 3125.)

Defendant ran to his nightstand and reached inside a drawer while yelling that he was going to "blow you all away." (Bates No. 3125.) Officer Dial, who was standing near the bedroom door, could see a firearm and magazine in the open drawer in the nightstand. (Bates No. 3125.)

As Defendant reached for the firearm, the officers drew their duty weapons and commanded Defendant to show his hands. (Bates Nos. 3125, 3135.) Defendant complied but continued to scream at the officers that he would shoot them all and that he wanted the officers to shoot him. He yelled, "fucking shoot me pussy, do it, do it!" (Bates No. 3125.) Officers continued to yell at Defendant to move away from the gun, and then tried to reason with Defendant. (Bates No. 3125.)

Defendant called his father and Officer Dial continued to speak with Defendant and Defendant's father. (Bates No. 3135.) After Defendant spoke with his father, Defendant called 911 several times and screamed at the dispatcher to send the SWAT team because the officers were not "real cops." Defendant also told the 911 operator that he was going to "blast them away." (Bates No. 3125, 3135.)

Officers continued to try to reason with Defendant, but each time they thought they were making progress, Defendant would revert back to threatening to shoot the officers,

begging to get shot, or trying to cover himself with a blanket to avoid getting tased. (Bates No. 3126.)

TPD Officer Castro saw a knife on top of the dresser within arm's reach to the Defendant's right. (Bates No. 3131.) Officer Castro was advised there was a handgun in the dresser that the knife was on. (Bates No. 3131.) Defendant then stated that he was going to get his knife, and reached toward the nightstand. (Bates No. 3136.) Officer Porras was forced to deploy her Taser at Defendant. After being tased, Defendant continued to fight and tried to bite the officers. He was detained and transported to the CRC. (Bates No. 3126.)

After Defendant threatened to shoot the TPD officers on August 18, 2017, the firearm, a 9mm Glock Model 19 semi-automatic, serial number ABXK613, purchased by Defendant in June of 2016, was placed into TPD evidence storage for safekeeping. (Bates No. 3150, 3154.)

## 2. **The Purchase of the Lower Receiver Used to Murder Deputy C.W.**

On August 30, 2017, Defendant was served with an Injunction Against Workplace Harassment filed by Pima Community College. (Bates No. 3656.) Defendant was ordered by Tucson City Court, Judge Pollard, not to own or possess firearms. (Bates No. 3657-3658; M1041PO17049432.) The injunction stated that it would expire one year from the date of service. (Bates No. 3657.)

On January 23, 2018, Defendant purchased a Weaponsmart, model WMX15 lower receiver.  This lower receiver was part of the assault rifle Defendant used to murder Deputy C.W.

**3.  <u>Defendant's Threats to Law Enforcement to Return His Glock 19 Firearm.</u>**

On April 16, 2018, Defendant accused TPD Officer Porras of stealing his Glock handgun on August 18, 2017.  Defendant wrote in an email that "[t]his is bullshit and frankly my patience is wearing thin.  Return my property to me immediately."  (Bates No. 3053.)

A few weeks later on May 25, 2018, Defendant filed another complaint demanding that TPD "[g]ive me back my shit immediately!" ( Bates No. 3038.)  Defendant referred to TPD Sergeant Winsky (a member of the TPD MHST) and Officer Dial as "criminal scum bags" and complained about "bullshit injunctions" (referencing the stated reason TPD would not return his firearm).  (Bates No. 3038.)

On the morning of June 12, 2018, Defendant threatened TPD, writing that he would arrest the front desk officer if his firearm was not returned to him immediately:

> Anyways, I demand that my property be released to me immediately! Here's what's likely going to happen if my property is not released to me:
>
> I go down to TPD evidence locker and  request my property back.  The person working at the front desk refuses.  At that point, I place him/her under citizens  arrest in accordance with AZ code 13-3884 for firearms theft pursuant to AZ code 13-1902 and take my property back anyways.
>
> I also plan on filing complaints everyday, maybe multiple times a day until my property is back in my possession.  (You can email me in response to this complaint)

12

(Bates No. 3039.)[6]

That afternoon, on June 12, 2018, Defendant escalated the threat to TPD to return his property:

Hello TPD,

I currently reside at [redacted] North 15th Avenue, Tucson, Arizona, 85705. The entire Tucson Police Department is banned from my property. Failure to comply will constitute an immediate threat on my life and an act of war.

From Ryan Schlesinger

(Bates No. 3171.)

On June 13, 2018, the threats again escalated when Defendant emailed TPD stating that TPD needed to "[g]ive me back my fucking property or else." (Bates No. 3040.)

On June 14, 2018, Defendant threatened to arrest TPD officers if TPD did not return his firearm.

Hey, you pussies need to release my property which you stole from me on August 18th, 2017. I have no problem placing you ass clowns under citizens arrest, so just give me back my property.

(Bates No. 3041.)

On June 16, 2018, Defendant wrote:

As a fuck you to the TPD, I sent a pic of some glock mags I took on my kitchen table to Stacie Schaner's email address. Anyhow, the TPD needs to return my shit to me immediately!"

---

[6] The Defendant's writings, emails, and complaints may be cited in part in this motion. However, the government intends to admit Defendant's writings, emails, and complaints discussed in this motion in their entirety. They were disclosed to defense at the Bates numbers noted and are available for the Court's review at the Court's request.

(Bates 3042, 3160.)[7]

On June 19, 2018,[8] Defendant designated TPD a "terrorist organization":

> Congratulations TPD,
>
> by continuously failing to release my property you have prematurely escalated this situation. What happens next is on you. The TPD is now a designated terrorist organization. For all TPD employees that do not wish to be treated as "terrorists" and "unlawful enemy combatants", surrender yourself immediately to real "law enforcement".

(Bates No. 3044.)

The next day, on June 20, 2018, Defendant emailed TPD that if TPD did not release his firearm immediately that TPD could be "upgraded" beyond being already designated a "terrorist organization." (Bates No. 3045.) Defendant also named Officer Porras, Sergeant Schaner, and Sergeant Winsky by name.

On June 23, 2018, Defendant, who had tried to "liberate" a police cruiser as collateral for his firearm, emailed TPD another threat:

> The point here is that y'all need to think deep and hard about how far you're willing to take this. Ask yourself, what are you willing to sacrifice because if my property is not returned to me having a police cruiser repoed will be the least of your concerns.

(Bates No. 3046.)

On June 27, 2018, Defendant requested the location of the TPD property facility where Defendant's firearm was being held and wrote about his previous request for

---

[7] Sergeant Stacie Schaner is in the TPD Office of Professional Standards and was assigned to address Defendant's complaints against TPD. (Bates No.3052.)

[8] Also, on June 19, 2018, Defendant filed a motion in Tucson City Court to order TPD to release his firearm. (Bates No. 3653-3654.) Defendant's motion was denied. (Bates No. 3652.)

"intelligence on how many armed guards they got at any given time, security vulnerabilities, panic alarms, etc." (Bates No. 3047.)

### 4. The Defendant's July 3, 2018 Interview

Defendant's contacts with TPD were escalating.[9]  On July 3, 2018, TPD Detective Golden with the MHST and Detective Harper interviewed Defendant at the TPD Westside Substation. Defendant came to the substation at Detective Golden's request.  (Bates No. 3806).  Defendant told Detective Harper that "I may want a lawyer – you know.  We'll see." (July 3, 2018 Interview Transcript, Bates No. 5350.)  Detective Harper then told Defendant that at "any point, you're free to go."  Id.

Defendant complained to the officers that "[y]ou stole my property on August 18th" and "I feel like you guys fucked me over on the 18th." (Bates No. 5379, 5401-5402.) Defendant told the officers that because of the experience on August 18, TPD was "banned" from his property.  (Bates No. 5433.)  As discussed above, TPD officers responded to Defendant's residence on August 18, 2017, to transport him for an involuntary mental health evaluation.  Defendant reached for his nightstand where a firearm was located and the officers placed the firearm in a TPD evidence storage for safekeeping.

Defendant was again advised that his firearm could not be returned because of an order of protection against him. (Bates No. 5351, 5353.)  Defendant acknowledged that he

---

[9] The government may also seek to introduce evidence that on or about June 3, 2018, Defendant sent an email to a militia group in Arizona requesting assistance to forcibly retrieve his firearm from TPD evidence storage. When asked about reaching out to a militia group during the July 3, 2018, interview, Defendant acknowledged the email and stated that, if he stormed the evidence building himself, he could not retrieve his property without casualties, and then stated that he did not want any casualties. (Bates No. 5370-5371, 5417).

15

had two injunctions against him, by PCC and also a PCC employee, and discussed them both with the officers. (Bates 5354-5358, 5361.)[10]

Detective Golden told Defendant that some of Defendant's emails and phone calls were scaring people. Defendant responded that "I like keeping people scared until – at least until I get my property back… ." (Bates No. 5352.)

When asked if he had any additional firearms, Defendant replied, "[n]o comment." (Bates No. 5363.) Defendant stated he had no intention of buying a firearm from an FFL (a federally licensed firearm dealer) in the "foreseeable future," but then asked if his concealed carry permit would allow him to pass a background check. (Bates no. 5366-5367.) Detective Harper explained to defendant that possessing a firearm with an injunction that prohibited the possession of a firearm would be a violation of law. (Bates No. 5368-5369.)

Detective Harper asked Defendant if he needed to worry about Defendant showing up at the department armed with a rifle. (Bates No. 5418.) Defendant stated "no." However, when asked if he had a rifle, Defendant replied, "no comment" while knowing that he had already purchased a lower receiver. (Bates 5418.) Specifically, Defendant did not tell officers that on January 23, 2018, he purchased the Weaponsmart lower receiver that he later used to murder USMS Deputy C.W. and attempt to murder and assault other task force members. (Bates No. 837, 843.)

---

[10] Defendant stated that the injunction by the PCC employee was set to expire on August 21, 2018. The other injunction by PCC was estimated to expire on August 31, 2018, or September 1, 2018. (Bates no. 5370, 5372.)

Defendant told the detectives about his plan to arrest Officer Custez [sic] at the TPD Westside Substation later that day because Defendant knew the officer came in at 2:30 pm. (Bates No. 5396, 5401).  Defendant would deliver him to another officer who was not a "criminal."  (Bates No. 5399, 5401.)

Defendant asked about a close family member taking custody of his firearm because he was not allowed to do so.  (Bates No. 5416.)  Defendant tried to bargain with the detectives by saying he would stop the hostile emails to TPD if TPD returned his ammunition and magazine.  (Bates No. 5426.)

The next day on July 4, 2018, Defendant asked that that his firearm be released to his father until he could possess it.  (Bates No. 3819.)  On July 16, 2018, Defendant's Glock, Model 19 pistol was returned to his father.  (Bates No. 3383, 3548-3549.)  Also on July 4, 2018, Defendant sent an email to Detective Harper and Detective Golden that he would work through the courts to get his firearm.  (Bates 3808.)

### 5.  Defendant Goes to Officer Dial's Parents' Home.

On August 24, 2018, Defendant purchased a Glock 9, Model 19 Gen5, from a firearms dealer in Tucson.  (Bates No. 838.)

Two days later, on August 26, 2018, Defendant sent emails to TPD Sergeant Winksy, Detective Golden, and Officer Dial, threatening that he would no longer leave the officer's families out of Defendant's "beef" with TPD.  (Bates No. 3359, 3759, 3760.) Defendant wrote to Sergeant Winsky that "[y]ou should never have crossed me."  (Bates No. 3759.)  In his email to Officer Dial, the Defendant explained he was going to retaliate

against him for officers speaking to Defendant's father about Defendant's mental health. Defendant wrote:

> Does your mother like getting fucked up the ass? I was planning on keeping peoples families out of my "beef" but since the TPD has no intention of doing so, than neither will I. Your parents live at [address redacted], right? I think I might just pay them a visit. Crossing me was the biggest mistake of your life.

(Bates No. 3760.)

That same day, at about 9:45 a.m., Defendant went to the home of Officer Dial's parents.[11]   (Bates No. 3459–3460.)   Officer Dial and his immediate family were temporarily staying at his parents' home and Officer Dial was the one who answered the door.  (Bates No. 3461, 3463–3464.)  Defendant asked Officer Dial to speak with Dial's parents so that he could ask them questions about Dial. (Bates No. 3459–3460.)  Defendant was told that he was not welcome and that he needed to leave.  (Bates No. 3460.)

The Pima County Sheriff's Department (PCSD) investigated the incident.  In a phone call, PCSD Deputy Zerbe discussed the email that Defendant sent to Officer Dial. (Bates No. 3464.)  The Deputy told Defendant that he read the email and that the Deputy thought Defendant sounded angry about the investigation that TPD conducted and about the questions that TPD asked his father about Defendant.  Defendant stated that he could not disagree with the Deputy's Statement.  (Bates No. 3464.)   After the Deputy asked

---

[11] The email to Officer Dial in which Defendant stated that he would not keep families out of his "beef" was sent at 9:22 a.m.  However, it is believed that Officer Dial had not read the email when Defendant arrived at the Officer's parents' house.  (Bates No. 3359, 3464.)

Defendant if the visit to Officer Dial's parents' house that day was in retaliation for that investigation, Defendant acknowledged that the visit was in retaliation. (Bates No. 3464.)

On August 29, 2018, Defendant was served with a petition for involuntary emergency mental health evaluation based on Defendant's threat against Officer Dial. (Bates No. 3202, 3475.)   The Application for Emergency Mental Health Evaluation included a description of Defendant's visit to TPD Officer Dial's Parents' home, detail about a message from Defendant that "[c]rossing [defendant] was the biggest mistake of your life," and Defendant's statement that he would do "whatever necessary" to take the officer into custody. (Bates No. 3202, 3359.)

Also on August 29, 2018, Defendant was served with injunctions against harassment filed by TPD MHST Detective Matthew Golden, Sergeant Winksy, and Officer Dial. (Bates No. 3826.)

### 6.   Defendant's Emails Continue:  He Declares An "Act of War."

On September 15, 2018, Defendant emailed TPD that numerous officers, including Winsky, Dial, and Kingman, should be charged with crimes; and, that on August 18, 2017, he was held at gunpoint for no lawful reason by Officer Dial and kidnapped and taken to the CRC. (Bates No. 3048-3050.)

On November 4, 2018, Defendant emailed TPD that any attempt to arrest him would be considered an "act of war:"

Hello Tucson Police Department,

I am not nor have ever been mentally ill. Any attempt to "petition" me, "Emergency petition" me, obtain a "court ordered evaluation", "Court ordered treatment", detain for mental health evaluation, or similarly

19

under Arizona Title 36 will be considered an immediate threat on my life and an act of war.

Also, I am not a criminal nor do I engage in criminal activity. Any attempt to arrest me or obtain an arrest warrant against me will also be considered an immediate threat on my life on my life [sic] and an act of war.

(Bates No. 3051.)

### 7.   Defendant Goes to the TPD Station to Arrest Sergeant Kingman

On November 20, 2018, Defendant appeared at the TPD station located at 1310 W. Miracle Mile, stating that he was there to speak with TPD Sergeant Kingman.  When Sergeant Kingman entered the lobby of the building, Defendant addressed her by name and stated that he was there to "arrest" her.  (Bates No. 3364, 3367.)  When Sergeant Kingman informed Defendant that he would not arrest her, Defendant asked "Will you be here tomorrow so I can place you under arrest then?"  When Sergeant Kingman said, "No," Defendant stated, "I mean I could just show up at your house and do it."  (Bates No. 3364.)

On November 22, 2018, Defendant filed an online complaint in which he referenced his visit to the TPD Westside Substation on November 20, 2018, to arrest Sergeant Kingman.  He stated that the TPD Sergeant was "on his list" of people to arrest and that he would return to arrest her.  Defendant wrote about playing out "the most likely scenario" of the Sergeant's arrest by Defendant:

So let's play out the most likely scenario here...I go attempt the citizen's arrest. Sgt Kingman resists.  I disarm her of her weapon pursuant to AZ code 13-3895.  By this time, other TPD employees there will or already have drawn their weapons and are pointing them at me instead of at Sgt Kingman.  At that point I have no choice but to render harmless the threat/s. I would highly recommend that the TPD arrest the criminals

20

listed in my report so I don't have to.  I don't think anybody wants this turning into shootout at the OK Corral.

(Bates No. 3054.)

## 8. Officers Attempt to Contact Defendant to Serve An Involuntary Emergency Mental Health Evaluation Order Days Before the Murder.

On November 26, 2018, TPD Officers Hussman and Schladweiler with the MHST went to Defendant's residence to serve an involuntary commitment order on Defendant because of Defendant's threat to arrest Sergeant Kingman.  (Bates No. 3349.)  After obtaining the petition, officers made several attempts to contact Defendant at his residence without success, despite evidence he was home.  (Bates 3858.)

On November 29, 2018, at about 3:31 p.m., Defendant emailed TPD, stating that TPD had knocked on his door November 26 and 28, and that he thought that TPD was trying to "petition" him.  Defendant reminded TPD that he had banned the entire Tucson Police Department from his property.  He referenced his November 4, 2018, email where he threatened that an attempt to seek a mental health petition would be treated as "an act of war."  Defendant continued:

> Now that the TPD has declared war, under what terms would you be willing to surrender?  I am open to all reasonable offers.  And not only do I advise you to surrender quickly but I urge you to do so or else this situation will escalate very rapidly.  If I don't hear back from the department within a reasonable time frame via email, I'll have no choice but to assume that you have no intention of surrendering.  Play stupid games, win stupid prizes.

(Bates No. 3055.)

On November 28, 2018, TPD Detectives obtained an arrest warrant for Defendant for felony stalking of Sergeant Kingman.  (Bates No. 604.)  It was this arrest warrant that the task force was attempting to serve when the Defendant fired on the task force members and murdered Deputy C.W.

Afterwards, during the search warrant execution at Defendant's residence, officers found a list of the officers in the TPD MHST, including those targeted by Defendant. (Bates No. 898.)  *See also infra., Beckman v. State*, 230 So.3d 77, (Ct. App. Fl, 2017) (defendant's list of those he wanted to punish admissible in first degree murder case to show intent).

**C.      The Evidence Is Not "Other Acts" Evidence Because It Is Inextricably Intertwined With The Charged Offenses.**

Evidence of Defendant's harassing and threatening conduct is inextricably intertwined as "necessary in order to permit the prosecutor to offer a coherent and comprehensible story regarding the commission of the crime." *Carpenter*, 923 F.3d at 1181

"It is obviously necessary in certain cases for the government to explain either the circumstances under which particular evidence was obtained or the events surrounding the commission of the crime." *Vizcarra-Martinez*, 66 F.3d at 1013.  Under this rationale, a defendant's grievances against a victim and threats made to that victim are inextricably intertwined with the evidence showing that the defendant ultimately acted on those grievances and carried out those threats. *See United States v. Linehan*, 835 F. App'x 914, 917 (9th Cir. 2020) (mem. decision), cert. denied, 141 S. Ct. 1749 (2021) (finding the

defendant's 30-year history of issuing violent threats against government officials who failed to respond to his grievances was inextricably intertwined with the charged acts of sending emails threatening to firebomb a United States embassy because the earlier threats "showed the basis for Linehan's belief that he was aggrieved and the durability and depth of his anger at government officials"); *see also United States v. Williams*, 291 F.3d 1180, 1189 (9th Cir. 2002) (holding testimony on defendant's prior assaults of victims was inextricably intertwined where the "beatings were an integral part of the transactions that constituted the crimes charged" and "allowed the government to present a coherent and comprehensible story about what took place"), overruled on other grounds by *United States v. Gonzales*, 506 F.3d 940 (9th Cir. 2007).

Here, the violent crimes that Defendant committed cannot be understood without the timeline of events in the preceding fifteen months. Defendant was angry with law enforcement based on his contacts with officers, including the service and attempted service of three separate petitions for involuntary emergency mental health evaluation and treatment. In the months leading to the homicide, Defendant continued to stalk, threaten arrest, and threaten bodily harm against law enforcement officers. Defendant's actions culminated in the felony arrest warrant for stalking Sergeant Kingman that the task force was attempting to serve when Defendant murdered USMS Deputy Marshal C.W.

In the days before the murder, Defendant thought that TPD was trying to "petition" him again, and reminded TPD that officers were "banned" from his property and that their failure to comply constituted "an act of war." (Bates No. 3055.) When Defendant used an

assault rifle to open fire on the task force members on November 29, 2018, he had prepared for such an incident to retaliate against law enforcement for perceived grievances.

The evidence described above shows that Defendant had long-standing grievances against law enforcement based on the multiple service of civil commitment petitions and the seizure of his handgun. Defendant already acted on these grievances by attempting to "arrest" officers and by repeatedly threatening law enforcement. A trial without any mention of why law enforcement attempted to serve the arrest warrant on November 29 would leave gaping holes in the jury's understanding of what happened that day and why. And Defendant's course of threats and harassment provides immediate context for why he fired on and ultimately killed Deputy Marshal C.W. Defendant's emails show that he considered law enforcement entering his property as an "act of war."

The inextricably intertwined evidence described above thus proves motive, premeditation, malice, and intent. This is particularly salient in a case where the defendant's mental state is likely to be a key point in dispute. The evidence shows that Defendant's decision to open fire on November 29 was premeditated retaliation for the events of the prior fifteen months. Defendant had prepared for what he considered an "act of war."

Because this evidence is offered to complete a coherent narrative for the jurors and not to show conformity to character, "the policies supporting the exclusion of evidence under Rule 404(b) are inapplicable." *United States v. Ramirez-Jiminez*, 967 F.2d 1321,

1327 (9th Cir. 1992). Therefore, this Court should allow the evidence without going through the Rule 404(b) analysis.

### D. In The Alternative, The Evidence Is Admissible Under Rule 404(b).

Although the above evidence is admissible as inextricably intertwined with one or more charged offenses and no Rule 404(b) analysis is therefore required, the evidence is also admissible, in the alternative, under Rule 404(b). In particular, Defendant's prior threats to law enforcement, whom he perceived as failing to respond to his grievances, are properly admitted under Rule 404(b) to show motive, opportunity, intent, preparation, plan, and knowledge regarding the charged crimes. Defendant harassed, stalked, and threatened law enforcement officers for serving him with civil commitment petitions and seizing his firearm. On June 12, 2018, Defendant "banned" TPD from his property and declared that that failure to comply "will constitute an immediate threat on my life and an act of war." (Bates No. 3171). On June 19, 2018, Defendant designated TPD a "terrorist organization" On November 4, 2018, Defendant warned TPD that any attempt to arrest him would be an "act of war." (Bates No. 3051.) On November 22, 2018, he threatened that if TPD did not do what he wanted – arrest Sergeant Kingman – that the "most likely scenario" would turn into a "shootout at the OK Corral" when he returned to the west side substation to arrest Sergeant Kingman. (Bates No. 3054). On the day he opened fire on the task force members, Defendant emailed TPD that "[n]ow that TPD has declared war, under what terms would you be willing to surrender?" Defendant ended his email with "[p]lay stupid games, win stupid prizes." (Bates No. 3055.)

This is strong evidence that when Defendant shot at officers—including Deputy Marshal C.W.— Defendant did so intentionally and with premeditation. *See United States v. Chase*, 301 F.3d 1019, 1026 (9th Cir. 2002) (in case involving threats against federal agents; affirming the admission of evidence showing that the defendant made threats to others in addition to FBI agents to show motive of retaliation to harm FBI agents), aff'd en banc *United States v. Chase*, 340 F.3d 978, 993 (9th Cir. 2003) (affirming the panel's decision on the admissibility of "evidence of other threats"); *Linehan* 301 F.3d at 1022-1023 (holding a defendant's threat to firebomb an embassy was admissible under Rule 404(b) to show the defendant's intent to retaliate against federal agents for what defendant perceived to be the agents' failure to take action on complaints he had submitted*); See also Beckman v. State*, 230 So.3d 77, (Ct. App. Fl, 2017) (defendant's list, naming his father, teachers and classmates, along with testimony about unrelated incidents to provide an understanding of the list, including defendant's intent to punish, admissible to show defendant's intent to kill his father.)

The evidence is not remote. The 15-month period of time described above and which culminated in the shooting on November 29, 2018, is not too remote in time. Because the evidence is admissible for a non-propensity purpose, it is admissible under Rule 404(b).

26

**E.  Under Rule 403, The Evidence is Highly Probative of Motive, Intent, Premeditation, and Malice, and Is Not Substantially Outweighed by the Danger of Unfair Prejudice.**

Evidence of other acts must also satisfy the Rule 403 balancing test—its probative value must not be substantially outweighed by the danger of unfair prejudice.  Even when "[r]elevant evidence is inherently prejudicial," Rule 403 only comes into play when evidence involves "unfair prejudice" that has "undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *United States v. Hankey*, 203 F.3d. 1160, 1172 (9th Cir 2000) (citation omitted).  "Unless trials are to be conducted as scenarios, or unreal facts tailored and sanitized for the occasion," a court's use of Rule 403 should be "cautious and sparing[,] . . . limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." *Id.* (citation omitted).

Here, the balance weighs in favor of admission.  As inextricably intertwined, the evidence is integral to establishing a coherent and complete picture of Defendant's motive, intent, and murderous conduct. *Linehan*, 835 F. App'x at 917 ("Admitting the evidence of the prior threats did not present an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.") (quotation marks omitted).  As "other acts" evidence, the evidence is strong proof of key elements of the charged offense, especially the intent to murder and premeditation.

Prejudice is especially unlikely given the seriousness of the charged offense of murder. *Cf. United States v. Ramirez-Robles*, 386 F.3d 1234, 1244 (9th Cir. 2004) (holding

the erroneous admission of one prior conviction was harmless because another, more serious, prior conviction was admissible, so the jury's knowledge of the less-serious conviction was unlikely to have impacted its verdict).   To the extent that any prejudice exists, this Court can give limiting instructions to "further prevent the potential for unfair prejudice."   *See United States v. Thornhill*, 940 F.3d 1114, 1123 (9th Cir. 2019) (using limiting instruction).

Accordingly, the evidence passes Rule 403's threshold and should be admitted.

//

///

///

//

//

//

//

### III.   **Conclusion**

For the foregoing reasons, Defendant's other acts are admissible as "inextricably intertwined" evidence. In the alternative, the evidence is admissible under Rule 404(b) and the government gives notice and moves for admission. In addition, the evidence is admissible under Rule 403. Ultimately, this Court should find the evidence admissible and grant the government's motion *in limine*.

Respectfully submitted this 28th day of July, 2022.

GARY M. RESTAINO
United States Attorney
District of Arizona

*s/ Jane L. Westby*
*s/Sarah B. Houston*

SARAH B. HOUSTON
SHELLEY K.G. CLEMENS
JANE L. WESTBY
Assistant U.S. Attorneys

Copy of the foregoing served
Electronically this 28th day of July, 2022 to:

Brad D. Levenson, Esq.
Christopher P. Frey, Esq.
Theresa Michelle Duncan, Esq.
Martin L. Novillo, Esq.
Attorneys for Defendant