GARY M. RESTAINO
U.S. Attorney
District of Arizona
SARAH B. HOUSTON
Arizona State Bar No. 026691
JANE L. WESTBY
Arizona State Bar No. 017550
Assistant U.S. Attorneys
United States Courthouse
405 W. Congress Street, Suite 4800
Tucson, Arizona 85701
Telephone: 520-620-7300
Email: sarah.houston@usdoj.gov
       jane.westby@usdoj.gov
Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>Ryan Phillip Schlesinger,<br><br>　　　　　Defendant. | CR 18-02719-TUC-RCC (BGM)<br><br>GOVERNMENT'S REPLY TO DEFENDANT'S RESPONSE TO MOTION TO ADMIT INEXTRICABLY INTERTWINED EVIDENCE, AND ALTERNATIVELY RULE 404(B) EVIDENCE (Dkt. No. 475) |

　　　　The United States of America, by and through undersigned counsel, respectfully submits this reply to Defendant's Response (Dkt. No. 475) to the Government's Motion to Admit Inextricably Intertwined Evidence, and Alternatively, Rule 404(b) Evidence ("Government's Motion") (Dkt. No. 446). This reply is supported by the following memorandum of points and authorities and all matters of record.

**I.	The Timeline of Events Beginning in August 2017 Shows Defendant's Premeditation, Planning, Intent, Knowledge, and Motive to Murder and Assault the United States Deputy Marshals on November 29, 2018, and Are Admissible as Inextricably Intertwined Evidence and/or Non-Propensity Rule 404(b) Evidence.**

When Defendant murdered U.S. Deputy Marshal C.W. and assaulted the other U.S. Deputy Marshal victims by intentionally shooting at them, he acted out of anger and with a motive to retaliate against law enforcement because TPD had seized his firearm on August 18, 2017, and submitted two separate applications for an involuntary mental health evaluation ("involuntary evaluation") for Defendant pursuant to A.R.S. § 36-524. In response to these events Defendant sent a series of threatening emails and engaged in threatening behavior up until the time of the homicide and assaults in November 2018, further demonstrating Defendant's anger at law enforcement and his motive of retaliation.

As demonstrated below each piece of evidence is part of a chain of events that are logically connected and inextricably intertwined with the homicide and assaults, and/or is non-propensity Rule 404(b) evidence showing that the murder and assaults were premeditated, planned, intentional, lacking any mistake or accident, and are most certainly evidence that defendant was motivated by retaliation for his perceived past grievances with law enforcement.

1. August 18, 2017: The First Involuntary Evaluation, Defendant's Threats to Kill TPD Officers, the Seizure of Defendant's Pistol, and the PCC Injunction.

On August 18, 2017, TPD officers, including Officer Dial and Sergeant Kingman, went to the defendant's residence to serve an order for an involuntary evaluation. As discussed above, this involuntary evaluation order combined with another involuntary evaluation order served by TPD in August 2018, resulted in Defendant declaring an "act of war" if he was "petitioned" again just days before the homicide in November 2018. (Dkt. No. 446, pp. 19-20).

In addition, the events of August 18, 2017, also includes Defendant's attempt to reach for a firearm and his threat to the responding TPD officers to "blow [them] all away." (Dkt. No. 446, p. 10). This clearly shows Defendant's intent to harm law enforcement and that Defendant's actions on November 29, 2018, were intentional, knowing, and no mistake or accident. This evidence is also logically connected because it results in the seizure of Defendant's firearm which becomes one of the major components forming Defendant's retaliatory motive.

On August 30, 2017, about the same time as Defendant's involuntary evaluation for threatening to kill Pima Community College (PCC) Code of Conduct Officer Y.B., PCC obtained an injunction against Defendant which prohibited Defendant from possessing a firearm. (Dkt. No. 446, p.11). It is necessary to admit the evidence of the PCC injunction against Defendant to show that TPD lawfully retained Defendant's pistol. Without this evidence, the jury would be left to believe that TPD had no basis for retaining the firearm. Defendant may also attempt to argue that TPD was unjustified in retaining the firearm and the government would have no means to rebut this argument.[1]

Defendant argues that the involuntary evaluation in August 2017 is unrelated to the charged crimes because it involves a separate dispute with Y.B. and should not be admitted. However, it was the act of TPD obtaining the involuntary evaluation order in August 2017, and not the underlying "dispute" with Y.B. that set off Defendant's long-term grievance with TPD.

The government does not intend to call Y.B. at trial and intends to limit the evidence of the involuntary evaluation order to testimony from TPD Officer Dial, who obtained the order for transport. Officer Dial will testify that he was informed that Defendant had been expelled from PCC and that Defendant threatened, Y.B., the

---

[1] Based on the nature of the requested disclosure, Defendant may be already preparing to shift the blame to the victim U.S. Marshals. Therefore, Defendant's shifting the blame to TPD is not unexpected.

PCC Code of Conduct Officer, writing that, "[b]ut as far as mental health goes, Ms. [B] is suicidal. That bitch tries to go to war with me....well that means she is suicidal, You heard of suicide of cop, well Ms. [B] trying to commit suicide by student or ex-student I should say." (Dkt. No. 446, p. 9). Defendant also wrote a letter to TPD stating that if TPD did not act against Y.B. and arrest her for public corruption, he would take the law into his own hands. (Bates No. 12838).

The underlying reason for the involuntary evaluation order must be admitted to show that TPD's entry into Defendant's home and his transport for the involuntary evaluation was lawful. It is not offered as propensity evidence, and it is not unfairly prejudicial weighed against the brutality of the acts underlying the charged crimes. Moreover, assuming Defendant will launch a mental health defense, there is no prejudice from the evidence of the involuntary health evaluation order in August 2017, or the subsequent involuntary evaluation order in August 2018 (to which Defendant has not objected).

Defendant also argues that the evidence of the involuntary commitment from August 2017 can't be admitted because the evidence needs to be similar to show knowledge and intent. However, as discussed above the involuntary evaluation order is offered as proof of motive and need not be similar. The caselaw cited by Defendant on this point, *U.S. v. Charley* 1 F.4th 637 (9th Cir. 2021) and *United States v. Vo*, 413 F.3d 1010, 1017-18 (9th Cir. 2005), is inapplicable. (Dkt. No. 475, p. 8-9, fn. 6). In *Charley*, the inference of propensity was found because there was no logical connection between two prior assaults and the charged crime. Moreover, *Vo* is a drug case in which the similarity of the other act is often more important to prove "knowing" possession of the drug.

The opinions in *U.S. v. Chase and U.S. v. Linehan*, cited in the Government's Motion, demonstrate that acts need not be similar to be admitted for the proper purpose of showing motive. Defendant's involuntary commitments, threatening emails, and threatening behavior are a chain of events all "logically connected" to the

charged crimes and are admissible to show Defendant's motive for killing and assaulting the U.S. Deputy Marshals was retaliation against law enforcement for what had occurred starting in August of 2017 to the time of the murder. *See* U*nited States v. Chase*, 301 F.3d 1019, 1026 (9th Cir. 2002) (admission of evidence showing that the defendant made threats to others in addition to FBI agents shows motive of retaliation to harm FBI agents); *United States v. Linehan*, 835 F. App'x 914, 917 (9th Cir. 2020) (mem. decision), cert. denied, 141 S. Ct. 1749 (2021) (defendant's 30-year history of violent threats against government officials was inextricably intertwined with the charged acts of sending emails threatening to firebomb a United States embassy because the earlier threats "showed the basis for Linehan's belief that he was aggrieved and the durability and depth of his anger at government officials"); *U.S. v. Henson* 939 F.2d 584, 586 (8th Cir. 1991) (defendant's numerous threats in the month before fire concerning his intention to "get even" with his employer's security personnel admissible to show motive under Rule 404(b)).

2. <u>January 3, 2018.  Defendant Purchases a lower receiver for an assault style rifle.</u>

Defendant argues that the government has not articulated how the purchase of the lower receiver is relevant.  (Dkt. 475, p. 11).  However, as stated in the Government's Motion, the lower receiver, purchased by Defendant in January 2018, was used to kill U.S. Deputy Marshal C.W. and assault the other Deputy Marshals. The timing of the purchase -- after the seizure of his firearm in August 2017, and before his repeated threatening emails to TPD demanding the return of his firearm - shows planning and preparation by Defendant for an "act of war" against law enforcement.

//
//
//
//

### 3. April 16, 2018, through June 27, 2018 - The Threatening Emails; Defendant's TPD Interview in July 3, 2018.

Shortly after Defendant purchased the Weaponsmart lower receiver, Defendant sent threatening emails to TPD for the return of his 9 mm Glock pistol seized on August 18, 2017. Defendant's emails beginning in April 2018, and his July 2018 interview all show his increasing motive to retaliate against law enforcement for the seizure of his firearm in August 2017.

Defendant argues that Defendant's emails were merely an act of "self-help" for the return of his property and did not communicate an "act of violence." (Dkt. No. 475, p. 12). However, these emails all demonstrate Defendant's growing anger at law enforcement. Defendant's emails accused officers of stealing his pistol, threatened to arrest officers, threatened that "failure to comply will constitute an immediate threat on my life and an act of war," designated TPD a "terrorist organization," threatened that "y'all need to think deep and hard about how far you're willing to take this," and that "if my property is not returned to me having a police cruiser repoed[sic] will be the least of your concerns." (Dkt. No. 446, p. 12-14).[2] On June 27, 2018, Defendant called TPD to ask about where his pistol was being held and the security at that location. (Dkt. No. 446, pp. 14-15). The government will not seek to introduce in its case-in-chief the evidence that Defendant called upon a militia group to storm the TPD evidence locker unless Defendant opens the door.[3]

On July 3, 2018, TPD officers spoke with Defendant at a TPD station. Defendant told officers that "[y]ou stole my property on August 18th" and "I feel like you guys fucked me over on the 18th." (Dkt. No. 446, p. 15). This statement to TPD

---

[2] In support of this evidence, the government also intends to play a video of Defendant walking into a TPD station and asking for collateral such as a police cruiser. The government also intends to introduce the video of Defendant entering TPD to arrest TPD officers, including TPD Sergeant Kingman. This evidence shows Defendant's increasing resolve to obtain his firearm by any means. These videos have been disclosed.

[3] The government reserves the right to present any evidence should Defendant open the door to such evidence either in its case-in chief or in rebuttal.

officers, which again references the seizure of Defendant's firearm almost one year earlier on August 18, 2017, shows Defendant's continued grievance with law enforcement over his firearm and his motive of retaliation.

During the July 3, 2018, interview, Defendant admitted the injunctions against him and was told by the officers that possessing firearms while the injunctions were in place was unlawful. Defendant was intentionally evasive and answered "no comment" when asked about the possession of a firearm. (Dkt. No. 446, p. 16). Defendant knew that he had already purchased the lower receiver and his deceptive answer shows planning.

In the same interview, Defendant clearly indicated that he was planning to escalate the situation further. Defendant explained that he started sending emails "after I finished my bachelor's degree, so I could focus – because I wanted to focus on that, before I got involved in the – before escalate – potentially escalated this shit and got involved in this bullshit." (Bates No. 5372-5373). This is additional evidence of Defendant's planning.

4. <u>August 24, 2018, through November 4, 2018: Defendant Purchases a Pistol; Defendant Threatens Officers' Families and Visits Officer Dial's Parents' Home; Defendant Threatens Retaliation Against Officer Dial; Defendant Declares an "Act of War" on TPD.</u>

In August 2018, Defendant purchased a 9 mm pistol and two days later made a visit to Officer Dial's parents' home. Defendant admits that his visit to Dial's parents' home was in retaliation for mental health questions that Officer Dial asked Defendant's dad. (Dkt. No. 446, pp. 17-19). While there is no known evidence that Defendant was armed when he visited Officers Dial's parents' home, this is additional evidence of the escalation of Defendant's threatening conduct against law enforcement.

As a result of Defendant's trip to Officer Dials parents' home and his threats against Officer Dial, Defendant was transported for his second involuntary evaluation.

(Dkt. No. 446, p. 19). And as noted above, just before the homicide, Defendant's anger spiked when he thought that TPD was going to "petition" him again (which they were). Therefore, this second involuntary evaluation order and the reason for it – the threats against Officer Dial and the visit to his home – are all part of the culmination of events leading to the homicide and assaults charged in the Indictment.

The government does not intend to offer any extended testimony about the reason for TPD obtaining the involuntary evaluation order in August 2018. It is anticipated that Officer Dial will testify that the second application for an involuntary order was requested after Defendant went to TPD Officer Dial's parents' home and sent his threatening emails to Dial that "[c]rossing [defendant] was the biggest mistake of your life," and Defendant's statement that he would do "whatever necessary" to take the officer into custody. (Dkt. No. 446, p. 19).

In September 2018, Defendant again emailed TPD and stated that Sergeant Winksy, Officer Dial, and Sergeant Kingman should be charged with crimes and that he was held at gunpoint for no reason on August 18, 2017. (Dkt. No. 446, p. 19). This September 18, 2018, email shows that Defendant's anger remained fixed on the events of August 18, 2017, and shows without question that his motive and intent to kill a month later is a culmination of the events beginning on August 18, 2017.

On November 4, 2018, Defendant declared war on TPD a second time when he emailed them that any attempt to "[e]mergency petition" him or arrest him would be considered an act of war. (Dkt. No. 446, p. 19-20). This email foreshadows the murder and assaults less than one month later when Defendant thought that TPD was trying to "petition" him (which they were).

//
//
//
//
//

5. <u>November 20, 2018, through November 29, 2018; Defendant Attempts to Arrest Sgt. Kingman and Threatens an OK Corral Shootout; TPD Attempts to Serve an Involuntary Evaluation Order; Defendant Murders U.S. Deputy Marshal C.W. and Assaults the Other U.S. Deputy Marshals.</u>

In the days before the murder and assaults, Defendant attempted to arrest TPD Sergeant Kingman at a TPD substation. Two days later Defendant emailed TPD that Sergeant Kingman should be arrested and that he does not think that "anybody wants this turning into a shootout at the OK Corral." Sergeant Kingman was one of the officers who responded to Defendant's residence on August 18, 2017. Therefore, this evidence shows Defendant's ongoing and escalating anger against law enforcement for the events of August 18, 2017, just days before the homicide. It further shows Defendant's retaliatory motive and that the murder and assaults were not a mistake or accident.[4]

Moreover, on November 26, 2018, TPD attempted to serve a third involuntary commitment order, which according to Defendant's November 4, 2018, email was an "act of war." Three days later, Defendant murdered Deputy U.S. Marshal C.W. as he was trying to arrest Defendant for stalking Sergeant Kingman.

Therefore, the events leading to the homicide and assaults are inextricably intertwined with the events beginning on August 18, 2017, and\or are non-propensity Rule 404(b) evidence.

Finally, the probative value of the timeline evidence will increase when and if Defendant discloses a mental health defense. The timeline of events preceding the Defendant's crimes are highly probative to show that Defendant's actions were premeditated and that he had a plan to kill any law enforcement officers who came to

---

[4] In August 2018, TPD Officer Dial and Sergeants Kingman and Winsky filed injunctions against harassment against Defendant after Defendant threatened them. However, assuming that Defendant does not intend to impeach TPD Officers Dial, Winsky, or Kingman with the evidence of their injunctions against harassment against Defendant or otherwise open the door, the government will not present evidence of the filing of these individual injunctions, but does intend to present the underlying basis for the injunctions as discussed above: 1) the threats to Dial and the visit by Defendant to Dial's parents' home, and 2) the attempted arrest of Sargent Kingman and the threats to have a shootout if TPD does not arrest her.

- 9 -

"petition" him. On November 4, 2018, Defendant warned TPD that any attempt to arrest him, "petition" or detain him for a mental health evaluation would be considered "an immediate threat on my lie and an act of war." (Dkt. No. 446, p. 20).

## II. The Timeline of Events Admissible as Inextricably Intertwined Evidence and/or Non-Propensity Rule 404(b) Evidence are Not Unfairly Prejudicial.

Defendant argues that events leading up to the homicide should be precluded pursuant to Rule 403 of the Federal Rules of Criminal Procedure. "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. Rule 403 advises that relevant evidence should only be excluded when "its probative value is substantially outweighed by the danger of unfair prejudice." *United States v. LeMay*, 260 F.3d 1018, 1027 (9th Cir. 2001) (quoting Fed. R. Evid. 403).

Exclusion of evidence on this basis is rare. Rule 403 is "an extraordinary remedy to be used sparingly because it permits the trial court to exclude otherwise relevant evidence," and "the danger of prejudice must not merely outweigh the probative value of the evidence, but *substantially* outweigh it." *United States v. Mende*, 43 F.3d 1298, 1302 (9th Cir. 1995) (emphasis original) (internal citations omitted). Moreover, invocations that evidence should be excluded because it is "prejudicial" are to be rejected. "[I]n a criminal trial relevant evidence is inherently prejudicial; it is only when *unfair* prejudice *substantially* outweighs probative value that the rule permits exclusion." *United States v. King*, 713 F.2d 627, 631 (11th Cir. 1983) (emphases original).

As laid out in detail above, the evidence discussed is highly probative, and the strong probative nature of the evidence is not "substantially outweighed by the danger of unfair prejudice." *LeMay*, 260 F.3d at 1027. In the context of a case like this, none

of what has been discussed could be said to shock the conscience of the jury. The evidence is not cumulative but is necessary to present a coherent explanation of what occurred to the jury. With appropriate jury instructions when required by the law, there is no risk of confusion of the issues or misleading the jury. As such, there is no basis for preclusion under Rule 403.

Respectfully submitted this 27th day of October, 2022.

GARY M. RESTAINO
United States Attorney
District of Arizona

*s/ Jane L. Westby*
*s/Sarah B. Houston*

SARAH B. HOUSTON
JANE L. WESTBY
Assistant U.S. Attorneys

Copy of the foregoing served
Electronically this 27th day of October, 2022 to:

Brad D. Levenson, Esq.
Christopher P. Frey, Esq.
Theresa Michelle Duncan, Esq.
Martin L. Novillo, Esq.
Attorneys for Defendant